25 C.C.P.A.(Patents)

## HOWARD v. HUMPHREYS,
### Patent Appeal No. 3887.

Court of Customs and Patent Appeals.
June 27, 1938.

Charles M. Thomas, of Washington, D. C., for appellant.

Benjamin B. Schneider, of New York City, and Edward B. Beale, of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal in an interference proceeding from a decision of the Board of Appeals of the United States Patent Office reversing a decision of the Examiner of Interferences and awarding priority of invention of the subject matter of the counts to appellee, the junior party.

Appellant filed an application, serial No. 322,457, on September 8, 1919, upon which was issued patent No. 1,535,725, dated April 28, 1925. An application for reissue, serial No. 174,342, was filed March 10, 1927, upon which reissue patent No. 18,-357 issued on February 23, 1932.

Appellee filed an application, serial No. 548,531, on March 31, 1922, and received patent No. 1,647,629 on November 1, 1927. On January 26, 1929, he filed an application, serial No. 335,380, for reissue of the said patent and it is this reissue application and appellant's said reissue patent that are involved in this interference proceeding. Since both original applications copended, the burden to establish priority by a preponderance of the evidence rested upon appellee.

Three counts are involved, of which count 1 is representative and reads as follows:

"1. A method of making gasoline which consists in subjecting charging oil to cracking conditions of temperature and a superatmospheric pressure to convert the oil to produce hydrocarbon substances containing gasoline and heavier fractions, in separating the heavier fractions from the lighter gasoline-like products thereby producing a refractory distillate, and in subjecting a liquid body of such distillate to a cracking temperature while under a substantially increased pressure in an independent cracking zone where the distillate remains segregated from the unvaporized fractions of the charging oil."

The preliminary statement of appellee alleges that he conceived the invention set forth in the counts and disclosed it to others during the summer of 1917, and that he reduced it to practice on or about September 12, 1917. Testimony was taken to sustain these allegations.

No testimony was taken by appellant, who relies upon his first filing date, September 8, 1919, for proof of his inventive acts.

The Examiner of Interferences held that appellee was first to conceive the invention but that he was the last to reduce it to practice, and that he was not diligent from a time just before the appellant entered the field until he, the appellee, reduced the invention to practice, and accordingly awarded priority to appellant.

The Board of Appeals, in reversing the decision of the Examiner of Interferences and awarding priority to appellee, held that appellee's proofs showed a reduction to

practice prior to September 8, 1919, appellant's earliest date.

The subject matter of the counts is set out by the Examiner of Interferences as follows:

"This interference relates to a process for the production of gasoline. In carrying out the process oils heavier than gasoline are subjected to cracking temperatures and pressures. A distillate is obtained from the first step in the process which contains gasoline and heavier portions which are separated from the gasoline giving a refractory distillate. This refractory distillate is then subjected to a further cracking step at temperatures and pressures higher than those existing in the first cracking step. * * *"

The sole issue in this case is whether appellee reduced to practice in September 1917. If it be held that he did, the decision of the Board of Appeals must be affirmed.

The record discloses that appellee is an oil chemist and during all the time pertinent to this controversy, was first the assistant superintendent and later manager of his assignee, Standard Oil Company of Indiana, at Whiting, Indiana. It appears that in the process of cracking oils in the manufacture of gasoline and kindred products there is produced a material described as "naphtha bottoms" or "steam bottoms from motor spirits." These bottoms are of a very refractory character in the oil cracking process, as it was formerly practiced. At the time when appellee started his activities with relation to the subject matter of the counts, appellee's employer was using what is known as the "Burton Process." This process consisted in cracking the oil in a still under a maximum pressure of 95 pounds gauge pressure. In this cracking operation, a distillate was produced containing gasoline and heavier fractions. The distillate was then redistilléd, separating the gasoline and kerosene constituent, leaving the heavier fraction, known as "naphtha bottoms" or "steam still bottoms from motor spirits."

The bottoms appear to have been of very little or no value. As the cracking operations continued, the bottoms accumulated in volume and presented a problem of getting values from them. A very small portion was disposed of by mixing them with the charging stock of the process. When the quantity of bottoms, however, exceeded 15 per centum of the quantity of the said stock, the yield in gasoline diminished.

Appellee, as early as 1915, conducted experiments striving to develop a method of cracking this refractory material. In the course of these experiments he caused a still of five-gallon capacity to be built at the plant of his company, and set it up in a small building called the "experiment house," situated at the rear of the laboratory. This still was charged with the said bottoms, and distillations were made at pressures and temperatures higher than those used in the Burton stills. The pressures used in the experiments were gradually increased until a pressure of 200 pounds per square inch was reached. Feeling that the capacity of the five-gallon still was not sufficient to withstand a higher pressure, work was discontinued with it.

Another still of greater capacity—up to 20 gallons—was then fabricated to withstand higher pressures than 200 pounds per square inch. The same type of experimental work was conducted, and the new still was operated in 1916 and 1917 with a pressure up to 350 pounds per square inch. Appellee testified that while the still operated on a great variety of materials, his real interest was in the cracking of distillate bottoms.

Records were made during the runs in the still, which are said to show the kind and quantity of charging stock, the time the still was charged, the time the distillates began coming off, the time the run was concluded, and the temperatures and pressures from hour to hour. Several of the record cards are in evidence. One record card, part of Exhibit 1, shows that on September 12, 1917, a run was made in which the still was charged with "S. S. Bottoms from Motor Spirits," at pressures ranging from 300 to 310 pounds per square inch.

Exhibits 2, 3, and 4, relating to subsequent runs, are similar in all respects to Exhibit 1, and are dated September 14, 17, and 20, 1917, respectively. Some of the pressures shown are up to 350 pounds per square inch. The products resulting from the aforesaid runs were gasoline and a heavier fraction not suitable for gasoline.

The Examiner of Interferences held that the work in September 1917, while it

showed a date of conception as early as September 12, 1917, was not a reduction to practice. He reasoned that "The operation of the small still however cannot be considered a reduction to practice since it performed the process only on a laboratory experimental scale." The Board of Appeals, in reversing the decision of the Examiner of Interferences, said:

"According to records which are in evidence, this still was charged with steam still bottoms for motor spirits and operated at cracking temperatures and at pressures up to about 350 pounds per square inch. There are in evidence records of four test runs in which in the neighborhood of 90 pounds of material were charged and some 25 quarts of distillate recovered. The distillate recovered was fractionated and in all tests 60% or better was driven off at a temperature below 400° F. Of the material originally charged, according to the tests made, only a fraction of a percent vaporized below 400° F. The tests conclusively showed, therefore, that it was feasible to crack the refractory intermediate material with which the still was charged and to obtain therefrom a comparatively high percentage of material suitable for use as gasoline. It seems to us that these runs, while on a small scale, constituted a reduction to practice of the subject matter in issue. Appellee attempts to belittle the procedure above referred to by referring to the operations as 'miniature', 'microscopic' and 'Lilliputian'. While the operation was obviously not commercial, it seems to us that it was carried out on a sufficient scale to demonstrate the feasibility of converting refractory material such as was used as charging stock into gasoline. This was Humphreys' problem and this is the problem which is set forth in the counts. The problem of the counts is not the production of a still by which the process can be carried out. This is a separate problem with which we are in no way directly concerned. * * *"

It must be conceded, in view of the record, that appellee did succeed in producing gasoline by a cracking process not known before to the art. In view of the fact that there were no stills known to the art with which to perform his tests, he was compelled to have them fabricated. He did build a still, of relatively small capacity it is true, but he demonstrated that his process was successful in producing from the highly refractory bottoms a very good yield of gasoline.

The Examiner of Interferences grounded his holding with respect to appellee's lack of reduction to practice, in part at least, upon the theory that appellee and his witnesses did not consider that they had successfully reduced to practice. In support of this theory, the said examiner quoted the following testimony of appellee:

"Q. 264. Did you negotiate with them regarding the construction of other stills at any other time? A. Yes, after it became evident that the cracking of these naphtha bottoms on a commercial size still such as they had built for us was feasible and would probably be profitable, we began negotiations for the design and construction of larger batteries of high pressure stills."

"Q. 124. What further was done in the plant with respect to the pressure distillation operations at 325 pounds after this still started to operate? A. After determining that the operation of this still was successful we recommended the construction of additional high pressure stills to take care of the increasing quantities of naphtha bottoms caused principally by the lowering of the end points of gasoline."

The stills referred to in the above-quoted testimony of appellee were large commercial stills of a capacity of 325 pounds pressure per square inch. In order to understand the pertinence of this part of the record, it is necessary to further relate the history of the activities of appellee.

It appears that immediately after the tests of September 1917 appellee sought to have constructed apparatus that could be operated on a larger scale, commercially. The building of a large still was not something to be accomplished in a short time. The record shows that it required more than a year to perfect the plans and construct the still. It happened that at this time the heavy industries were being taxed to capacity to provide materials for the successful prosecution of the World War. In order to construct the large still it was necessary to secure quantities of steel. Because the steel industry was so essentially involved in the production of war material, no request for priority of orders was made by appellee's assignee; but as soon as the war was over, steps were immediately taken to have made a suitably large still.

619

The large still was installed in August 1920. It seems that this still was the first one of its kind known in the industry and that, because of its large size and the high pressure involved in its intended operation, the operators started it with runs requiring relatively low pressures which were gradually increased as the still continued to respond to the heat and greater pressure applied to it. The first run on naphtha bottoms alone took place on November 11, 1920, after some thirty runs of other material had been made.

Since that time the still appears to have been used for the cracking of naphtha bottoms for the most part.

It was subsequent to the successful operation of this large still that negotiations were had for the making of other large stills of the same kind and it was concerning this that appellee testified in the quoted excerpts of his testimony.

The Board of Appeals held that "The answers referred to have reference to commercial operation and in our opinion do not negative a belief that the process was successful when the small-scale experiments were completed." This holding of the board seems to us to be proper. No one can doubt, from the facts shown in the record, that appellee succeeded in solving the problem in the tests of September 1917. While the process was tested on a much smaller scale in 1917 than in the operations of the large specially constructed still, nevertheless it was exactly the same process, with the same kind of materials and the same results.

We are of opinion that appellee and his associates were convinced that the process had been successfully performed when they, without any loss of time, took steps, at great expense, to have fabricated a larger still to operate in commercial quantity. We are not concerned with the still or its size. It is reduction to practice of the process that is before us.

The tests in September 1917 were, in our opinion, sufficient to constitute a proper reduction to practice. It would seem that the Examiner of Interferences held that a process, such as that involved here, in the first instance and in an unknown field, cannot be reduced to practice until a new apparatus of commercial proportions is built and operated.

We held in Wietzel v. Lacy, 39 F.2d 672, 674, 17 C.C.P.A., Patents, 943, that—

"The authorities seem to be well settled that commercial production is not necessary to constitute reduction to practice."

In the instant case, it is our opinion that in order to establish reduction to practice of the process, it was not necessary to have built and operated the large commercial capacity still and that appellee did establish reduction to practice in the tests of September 1917.

Appellant contends that the tests of September 1917 cannot be considered a reduction to practice because of the problem of coke accumulation in the oil cracking process. He argues, in effect, that as the oil volume of the cracking stills becomes larger the coke accumulation becomes greater, but cannot be calculated, and that therefore nothing can satisfy the legal requirements of successful reduction to practice except the actual operation of the process in a still suitable in size for commercial operations.

It seems to be true that the deposit of foreign substances on the inside of the wall of the still would inhibit the communication of heat to the oil even to the degree of fusing the wall of the still. The run reports in evidence, however, make no reference to coke production and we think the inference is fair that the amount was negligible, as was stated by appellee during cross-examination.

That the size of the still was not considered of much importance is shown by the testimony of appellee under cross-examination as follows:

"XQ. 361. Now, Doctor, from your experience in the oil cracking art, you knew that the light or the data you got from results in these small experimental shell stills you employed in 1917 did not always hold true when those operations were amplified into large and useful units; isn't that correct? A. The results obtained on those small stills would be very close to the results obtained on large sized stills. There was some difference, of course, but not a very significant difference.

*    *    *    *    *    *

"XQ. 382. Now let us consider the small scale laboratory shell still cracking operation. Is it your view that the light you obtained as the result of such an experimental operation will hold true when that operation is magnified into a large and useful shell still cracking operation? A. It is my opinion that it will.

*    *    *    *    *    *

"XQ. 402. You know when you attempt to transform that operation into a large scale operation you immediately encounter many difficulties that are not encountered in the small scale operation, don't you? A. The difficulties differ only in magnitude. They are of the same type."

There is no evidence in the record to contradict this testimony on behalf of appellee, and we cannot assume, merely from the argument of appellant, that there would be large unpredictable accumulations of coke in a commercial still from the tests made by appellee in the small still.

We are in accord with the board in its statement that—

"The amount of carbon formed, the amount of gas wasted, the character of the carbon, etc. were matters that needed consideration when commercialized but it seems to us that the test runs definitely showed that the process could be successfully performed. * * *"

Among his reasons for appeal, appellant contends that the board erred in finding that the operations of appellee prior to his record date conformed to the counts and that the board also erred in finding that the counts do not inhibit the inclusion of substantial quantities of cracked distillates from the initial cracking zone of the process.

The position of the board on these contentions is set out as follows:

"It is strongly urged that the counts should be read to require an exclusion of intermediate boiling distillate from the charging stock of the initial operation and since the Humphreys testimony shows that it was customary to use from 5 to 15% of this material in the initial charging stock, that they were not proceeding in accordance with the requirements of the counts. The counts are all drawn broadly to the subjecting of a charging oil or charging stock to a cracking temperature or to cracking conditions. It seems to us that this is merely a broad statement and not an ambiguous one which warrants giving to the counts a restricted meaning in accordance with the Howard application. * * *

* * * * * *

"The initial stock used by Humphreys, in our opinion, is within the counts and the material produced by the Humphrey procedure in the Burton stills and in subsequent treatments of the distillate therefrom responds to the material specified by the counts for the second cracking operation. There is nothing in these counts as drawn that requires the second cracking operation to take place immediately following the first or that requires that all of the intermediate distillate from the first operation be used in the second. * * *"

As we read the counts they refer to "charging oil" and "charging stock" without limitation and are not ambiguous. We are of opinion that the charging stock or oil used by appellee, is within the counts as was held by both tribunals of the Patent Office, and that the counts do not inhibit the use of cracked distillates from the initial zone.

In view of the entire record, which we have examined with minute care, it is our opinion that a complete reduction to practice was made by appellee in September 1917.

The decision of the Board of Appeals reversing the Examiner of Interferences and awarding priority of invention to appellee is affirmed.

Affirmed.