**UNIVERSAL OIL PRODUCTS CO. v. GLOBE OIL & REFINING CO.**

No. 10744.

District Court, N. D. Illinois, E. D.
July 24, 1941.

See, also, D.C., 31 F.Supp. 665.

A. F. Reichmann, of Chicago, Ill., Thomas G. Haight, of Jersey City, N. J., William F. Hall and Charles M. Thomas, both of Washington, D. C., and Walter J. Blenko, of Pittsburgh, Pa., for plaintiff.

Thiess, Olson & Mecklenburger, of Chicago, Ill., and Arthur C. Denison, of Cleveland, Ohio, for defendant.

HOLLY, District Judge.

Plaintiff sues defendant charging infringement of two patents owned by it, one No. 1,392,629 granted to Carbon P. Dubbs, October 14, 1921, and assigned to plaintiff, and the other No. 1,537,593, granted to plaintiff May 12, 1925, upon the application of Gustav Egloff, each relating to a process of producing from heavier petroleum products a lighter oil capable of being used in internal combustion engines. Defendant says the patents are not valid, or if they are, it does not infringe.

Petroleum as it comes from the ground contains a variety of compounds composed of hydro carbon molecules, the various molecules being composed of atoms of hydrogen and carbon differently arranged and with differing numbers of carbon and hydrogen atoms. Many years ago it was discovered that by the application of heat some of these molecules could be broken up, some of the heavier carbon atoms separated from lighter hydrogen atoms and a lighter oil having a lower boiling point produced. This process is known in the art as "cracking".

With the development and increased use of the internal combustion engine came a greatly increased demand for the lighter oil known as gasoline. This fluid was recoverable from crude petroleum by a simple process of distillation and this method had been used for years, but the amount so produced was insufficient to meet the needs of modern industry. It was known that gasoline could be produced from the heavier oils by cracking and various inventors had been exploring the possibilities of so producing gasoline in commercial quantities.

The first practical process, the first that met with commercial success, was devised by Dr. Burton and put into operation during the year 1912. In his process about 8,250 gallons of a light oil which had theretofore been obtained from crude petroleum by distillation was put into a shell eight feet in diameter and thirty-two feet long. From that shell two vapor lines, each about 12 inches in diameter and 35 feet long led to a condenser. A fire was built under the shell and the liquid therein heated to a temperature of from 700° F. to 750° F. and became subject to antogenous pressure of about 75 pounds from the vapors and non-condensible gases produced by the heating. This temperature and pressure were maintained throughout the operation. The vapors generated passed up through the vapor tubes where they were subjected to partial condensation. The portion of the vapor condensed, termed reflux condensate, returned through the long vapor line to the shell where it was subjected to further cracking. The uncondensed vapor was passed on from the partial condensation chamber for further processing.

About twelve hours were required to bring the contents of the shell to the proper temperature and pressure, to bring the still "on stream". It remained "on stream" about 24 hours when it became necessary to draw the fires and withdraw the oil remaining in the still and remove the carbonaceous material which had been released during the operation and had adhered to the inner wall. This required about 12 hours.

This method had several disadvantages. A still could be "on stream" only about 24 out of every 48 hours. Only about 28% of the total charge was recoverable as gasoline. The "on stream" period was necessarily limited to 24 hours because experience had shown that the carbonaceous material accumulating on the bottom of the shell retarded the absorption of the heat by the oil, and caused "hot spots" to appear on the shell. If the "on stream" period were extended an explosion was likely to occur at these "hot spots" with serious danger to the life of those operating the still and great property damage as well. Several such explosions had occurred.

To overcome this danger of overheating a new process known as the Burton-Clark process was devised and put into operation about 1915. In this the heat is not applied directly to the shell. The oil is brought to a cracking temperature by passing through a nest of 4 inch convection tubes which are placed within the furnace, the tubes being connected with the shell. While in the tubes the oil was heated to temperature of from 720° F. to 725° F. and subjected to pressure of 95 pounds. This temperature was maintained throughout the entire system. The overhead apparatus for handling the vapors, returning the reflux condensate and securing the pressure distillate was practically the

same as for the Burton still and functioned in a like manner.

The cycle of operation of the Burton-Clark still was 72 hours, which included 15 hours necessary to bring the still up to pressure, thirty-six hours "on stream" and the remainder for shutting down, cleaning and getting the still ready for operation. The "on stream" period was limited to 36 hours for the same reason that the period was limited to 24 hours in the Burton process, coke accumulated where heat was applied to the tubes resulting in "hot spots". These were of frequent occurrence and caused buckling and often rupture of the tubes.

This was the state of the art as practiced commercially when Dubbs appeared on the scene. The problem to be solved was to crack the heavier hydrocarbons to produce gasoline without coking up the vessel in which the cracking occurred. Dubbs solved the problem.

Dubbs states in the patent granted to him that one of his objects is to provide a cracking process "in which the carbon containing residue is continuously removed from the cracking zone while the reflux condensate is returned to the cracking zone for further treatment substantially free from carbon; to provide a process which permits the apparatus to be operated for an extended period without the necessity of cleaning and in which that part of the system containing precipitated carbon is free from subjection to any excessive heat."

In his process Dubbs treats crude oil while in the Burton and Burton-Clark stills only gas oil (a lighter oil obtained from crude petroleum by distillation) could be used. The material to be treated is pumped into a nest of 4 inch tubes known as B tubes and during the time it is passing through said tubes they are subjected to sufficient heat to cause the desired amount of cracking. The oil is then passed into ten inch tubes designated as C tubes where vapor is liberated. This liberated vapor passes to an aerial condenser. The uncondensed vapor is passed on to other condensers. The vapor condensed in the aerial condenser is returned by gravity to the heating zone where, with the fresh feed, it is again subjected to cracking temperature. The residue in the C tubes is continually drawn off from those tubes. Pressure is maintained throughout the apparatus by means of a regulating valve. In the process a light fire may be maintained under the C tubes or they may be insulated to prevent loss of heat. In the illustrative run described in the patent Dubbs suggests subjecting the B tubes to a temperature of 750° F. to 860° F. and maintaining pressure on the oil of approximately 100 pounds to the square inch "which is caused by the pressure of the generated vapors".

In the discussion of the issues presented in this case it is agreed that claim 7 of the Dubbs patent may be taken as typical. That claim reads as follows: "7. A process of cracking oil consisting in continuously passing a stream of oil through a series of tubes seated in a cracking zone where the oil is heated to the cracking temperature but substantial vaporization prevented, and thence to an enlarged vapor chamber where vaporization takes place, removing the vapors from said chamber, subjecting them to an initial condenser where a portion of the vapors are condensed, subjecting the uncondensed portion of the vapors to a final condensation, returning the condensate from said initial condensation to the inlet side of the cracking tubes and continuously drawing off the residue from the vapor chamber and preventing it from returning to the cracking zone and maintaining a pressure on the oil during treatment."

Dubbs claimed many advantages over the processes then employed in the art. The cracking heat is applied to the B tubes only and as the cracking occurs principally in the C tubes there is no deposition of carbon, or coking, in the B tubes and all danger from over heating of these tubes is eliminated. The reflux condensate is not returned to the shell or tubes containing the carbonaceous residue, but is returned to the tubes containing the fresh feed and passed directly to the heating zone. The carbonaceous residue from the cracking is withdrawn from the C tubes and as this is withdrawn fresh feed may be pumped into the B tubes enabling the operator to operate the apparatus for a long period of time. In a demonstration run at Independence, Kansas, the system remained on stream nine days and was shut down then because the oil men who had come to witness the demonstration said they were satisfied. The Dubbs process was recognized immediately by the larger oil companies as a great improvement in the art and the

older processes of producing gasoline were practically abandoned.

Defendant contends, however, that there is nothing new in the Dubbs process except the "two-step" feature (heating the oil in one set of tubes and passing it into another where the cracking and deposit of carbon takes place), and in that Dubbs was anticipated by one Behimer; that all the other features of the Dubbs process, the return of the reflux directly to the heating coil instead of being returned to the chamber containing the carbonaceous residue and the constant withdrawal of the residue from the portion of the apparatus where the vapor separates from the heated oil, were old in the art and had been known for many years. On this phase of the case counsel for defendant cite British patent granted to Pielsticker No. 1308 of 1891, and United States Pielsticker patent No. 477,153, Hall patents No. 1,175,910 and 1,242,796, Ellis, No. 1,396,999, Alexander No. 1,407,619, Biddison and Boyd No. 1,345,740 and Greenstreet No. 1,740,691.

The Pielsticker patents were issued early in the '90's, the British patent in 1891 and the United States patent in 1892. By a rather strained construction counsel for defendant assert that they teach a withdrawal of residue and return of clear reflux to the heating tubes, but I do not find such teaching. The process as described by Pielsticker appears to be nothing more than simple distillation. A dome appears to be located with the distillation chamber, but it is not a condensing chamber such as is used as a necessary feature of a cracking operation. It is intended apparently to catch the droplets of oil that may be carried with the vapors and prevent their being carried over into the chamber where the vapors are condensed.

The Hall patents describe a vapor phase process, a process negatived by Dubbs, they do not teach a cycling process and the process of these patents when tried out by the Texas Company proved inoperable. It is stated by counsel for defense that the Texas operation was not that of the Hall patents, but if it was not Hall's employe constructed the plant, the Texas company had knowledge of his patents and his process or processes were never used by the company.

The Ellis patent, which shows a vapor phase process, does not teach a re-cycling process. The construction of the system as shown by his drawings is such as to prevent the return of reflux condensate to the heating tubes.

Alexander teaches eight different variations of cracking process, none of which had sufficient merit to induce an oil company to actually put them to use. The Gulf Oil Company did experiment with some one of the eight variations suggested by Alexander, though which one the testimony does not clearly show, but the experiment cost the company a million and half dollars and was a failure. That was the end of the Alexander processes so far as practical use was concerned. The patent in its descriptions and claims is very confusing and I am unable to find that it teaches the Dubbs process.

Biddison and Boyd teach three systems, only one of which, it is claimed, anticipates Dubbs. The teachings of this patent are not clear but after careful study, it seems to me it teaches a vapor phase system and that it does not teach a circulatory system such as Dubbs with a clean reflux being returned to the cracking tubes.

As to Greenstreet, if I correctly understand the testimony of the experts of the respective parties, the reflux returned for reheating contains the carbonaceous residue and is not clean.

With great skill and ingenuity counsel for defendant have argued that these patents clearly teach all that is contained in the Dubbs process. But the stubborn fact remains that the great oil companies with their staffs of highly trained technical experts never found it out. The Standard Oil Company of California maintained a research department in which some 200 technicians were employed at a cost of over a million dollars a year. Other great oil companies such as Texas, Gulf and Shell undoubtedly maintained laboratories and technicians to work on the problems presented by the process of obtaining gasoline by cracking heavier petroleum oils. If the prior art taught clean circulation so clearly, how did it happen that nothing better than the Burton and Burton-Clark systems was developed? It was not until Mr. Hanna, a representative of Standard Oil of California, visited a plant of the Shell Company at Martinez that the company learned the advantage of clear circulation and he wrote to his company.

"In studying over these reports, it would seem to me that we have picked up the following:

"1st. Cleanliness is next to Godliness.

"2nd. That the Dubbs people anticipate us in an appreciation of cleanliness.

"3rd. That circulation can be obtained without the use of a pump.

"4th. That higher pressures are very desirable. * * *

"5th. That if the maximum degree of cleanliness is maintained, higher furnace efficiency can be attained."

Mr. Hanna testified further: "When we discovered the clean circulation, which we found out at the Martinez unit, *we threw our hands up in the air and gave a cheer, that we had found a solution to our problem,* and we immediately went to work to get out our plans and designs to convert the 15 and 20 units."

Prior to the investigation of the Dubbs process by Standard of California the Royal Dutch Shell group of companies had become interested and sent their Mr. Pyzel, a chemical engineer who supervised the construction of refineries and their operations in this country for Shell companies, to investigate the Dubbs process and early in 1919 he observed the operation of the Dubbs experimental plant at Independence, Kansas. His company was owner of the Trumble patent. Concerning his observations he testified:

"My conclusion was that the Dubbs process as demonstrated to me in Independence, Kansas, showed one particular feature which made it far superior to the Trumble process which we were trying to develop ourselves, and that for that reason it would be to the interest of our company to come to some arrangement with the Universal Oil Products Company regarding their process.

* * *

"It was our conviction that * * * we should try to develop a process in which the heating of the oil to be cracked should take place in a tubular furnace through which the oil was flowing with sufficient velocity to prevent as much as possible the deposition of such material on the heating surface.

"Our work with apparatus built after the Trumble process mentioned before was going in this direction, but after witnessing the operation of the plant in Independence, I realized that we had made in this work a serious mistake, which was the returning of the heavier residual liquids from the evaporator to the cracking tubes.

* * *

"At the Dubbs plant at Independence such heavy residual liquid was not returned to the tubes, and only the raw oil mixed with the condensed heavy distillate entered those tubes. The result was that in the Dubbs plant at Independence the difficulties with coke forming in the tubes were very largely eliminated, but this same difficulty was practically the failure of our own efforts with the Trumble process."

He further testified: "And then when we saw this apparatus at Independence, Kansas, I said, 'My God, why didn't I think of that, to take that residuum out and have only clean reflux go back.' And that is the reason that we wanted to make the agreement with Dubbs, and that is why I expressed in that other letter in which I said, 'Well, we ought to recognize that we have been beaten by Dubbs.'"

Thereafter practically all of the great companies took out licenses under the Dubbs patents (the patents in suit and certain·other patents) paying millions of dollars in royalties for the privilege.

 This is more than mere commercial success. Here the recognized experts in the art saw the Dubbs process as new and revolutionary. And who was better qualified ·to judge? Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177, The Gray Processes Corporation v. Danciger Oil & Refineries, Inc., 42 U.S.P.Q. 315.

Perhaps more serious is the contention of defendant that Dubbs was anticipated by the work done by one Otto Behimer who filed an application for a patent on a cracking process November 21, 1918, almost four months earlier than Dubbs who filed his on March 19, 1919.

Behimer conceived the idea of clean circulation and the advantage which would result therefrom earlier than did Dubbs. He conceived some of the steps necessary to produce the desired result. He had worked out a method of heating the oil to a cracking temperature in one set of tubes, transferring this heated oil to a separate chamber where cracking should take place without the application of additional heat and carrying the vapors to a condensing chamber. But here he was balked. It was necessary to the opera-

tion of his system as he conceived it (and as Dubbs worked it out) to return the reflux to the heating coil and this he did not·know how to do. It did not occur to him, as it did to Dubbs, to return the reflux by force of gravity. He thought of only one way, the use of a pump, but so far as the evidence shows there was no pump on the market, and Behimer knew of none, capable of handling this hot oil. He experimented with a jet pump but it did not work satisfactorily.

Behimer at this time was in the employ of the Texas Company and had the use of all the facilities of that great corporation. He consulted with Holmes, president of the company and one of the outstanding engineers in the oil industry. Experimental plants were erected by the Texas Company, but abandoned. As Behimer testified there was a "joker" in his conception of the process, he did not know of any means of returning the reflux to the heating coils.

The Texas Company caused the application for a patent to be filed while experiments were being carried on, though it knew Behimer had not then conceived a workable process. This application was filed prior to the filing of Dubbs application. This filing, defendant contends, constituted a reduction to practice. But such is not the law. If the application for the patent is to constitute reduction to practice, the specification must be such as to enable one skilled in the art to construct a workable apparatus. Curtiss Aeroplane & Motor Corporation v. Janin, 2 Cir., 278 F. 454, 457.

One is not the discoverer of a new process until he has worked out all the steps necessary to produce the result he desires. To hold otherwise would be absurd. Behimer in his application stated that the reflux should be returned to the heating zone, but he did not state how that could be accomplished and he did not then know.

His application and his drawing accompanying it show a jet pump whose function is to return the reflux to the heating coil, but in his testimony admits that the jet pump did not work. We have here a situation where an application for a patent is filed when it is known that the method described was unworkable.

It was not until 1921 when the Texas Company received a circular advertising a pump devised by one Thompson that it again began to experiment with Behimer's conception. It did not use the Thompson pump but worked out a pump of its own device and this pump worked satisfactorily. Then, for the first time, in my opinion, was the Behimer conception reduced to practice.

The situation here is not the same as in the Telephone cases, 126 U.S. 1, 8 S. Ct. 778, 31 L.Ed. 863 cited by defendant to sustain its position that Behimer anticipated Dubbs. In that case it appeared that when Bell applied for his patent he had never actually transmitted telegraphically spoken words so that they could be distinctly heard. But he did actually describe a workable process. The only reason it had not worked was that it had not been carefully constructed, but as the court said (126 U.S. at pages 535, 536, 8 S.Ct. at page 783, 31 L.Ed. 863) "other instruments, carefully constructed, and *made exactly in accordance with the specification,* without any additions whatever, have operated, and will operate, successfully." (Emphasis mine.)

The failure of the Behimer system to operate was not the result of carelessness in construction, but was due to a fundamental defect, a lack of any means, conceived by Behimer, of successfully returning the reflux to the heating coil.

It has been suggested that even if the jet pump was not successful still nothing more than ordinary mechanical skill was necessary to find a method of returning the reflux. But the fact remains that neither the Texas Company headed by an outstanding oil engineer and with a great staff of experts, nor Behimer, a man of great ability, could or did think of a way. The method of returning the reflux by hydrostatic pressure seems simple now. It might seem to a court that ordinary mechanical skill would suggest that method, but it is not for the court now to say, in the face of the fact that the method did not occur to men of great skill who were earnestly working on the problem, that just ordinary mechanical skill was all that was necessary. Barbed Wire Cases, 143 U.S. 275, 283, 12 S.Ct. 443, 36 L.Ed. 154.

It is further suggested by defendant that Behimer's success with small laboratory equipment constituted a sufficient reduction to practice. It is true that it is not necessary always, to show an·operation·of a successful commercial

plant. Howard v. Humphreys, Cust. & Pat.App., 97 F.2d 616. But it appears from the report of that case that while the operation was carried on in a small still the inventor immediately had larger stills fabricated in which the operation was successfully carried out on a commercial scale and the experts testified, apparently without contradiction, that the results obtained in the large stills would be very close to the results obtained in the small stills, that there would be some but not a significant difference, and that the "light obtained" as the result of such a small experimental operation would hold true when that operation was magnified into a large and useful shell still cracking operation.

The inventor in that case had succeeded. Behimer had failed. That he had failed was conclusively evidenced by the fact that he abandoned all experiments on his process for several years. The only purpose in filing the application for the patent, as it appears to me, was to have it on record as an anticipation to be used against some one who might design a workable process.

It is true that commercial production is not necessary to constitute reduction to practice but it is also true that a process which cannot be successfully operated commercially does not satisfy the requirement that only useful processes may be patented. Besser v. Merrilat Culvert Core Co., 8 Cir., 243 F. 611; Houston v. Brown Mfg. Co., 6 Cir., 270 F. 445, 448.

Behimer in his testimony stated that he had the idea of returning the reflux by hydrostatic pressure, but in this he stands uncorroborated, and the elevation of the reflux condenser on one of the drawings of a draftsman of the Texas Company was considered by Behimer to be too great and he directed that it be lowered, noting on the drawing that the elevation should be "10 feet maximum".

We come now to a more serious problem: Does defendant's process infringe the Dubbs patent?

Defendant's process is essentially as follows: A fairly clean distillate is fed in a stream to cracking coils and subjected to temperatures up to 940° F. and pressures of 500 pounds. As this stream leaves the cracking coils, it is passed through a valve by which the pressure is reduced to 26 pounds. Then a second stream is conducted into the first, this second stream consisting of topped crude oil from a low pressure furnace. The merged stream is conducted into a "vaporizing chamber" (as plaintiff calls it) or "vapor separator" (as defendant calls it) where the vapors from the cracked stream pass out through the top into a bubble tower where partial condensation takes place, and from the top of which the vapors pass to a final condenser. The liquid residue which collects in the bottom of the vaporizing chamber, to use plaintiff's terminology, is drawn off and run to storage facilities. This residue is never re-cycled through the cracking tubes. The reflux liquefied in the bubble tower is re-cycled through the cracking tubes.

Defendant concedes that the oil, when it reaches the temperature of 940° F. and runs from the cracking coils to the vaporizing chamber, is by weight, 85 per cent vapor, and passes through the transfer line as foam.

Defendant contends that this process does not infringe plaintiff's patent. Whether there is infringement depends upon the meaning given to the word vaporization as used by plaintiff. In each of the claims of plaintiff's patent it is provided that in the passage of the oil through the initial tube substantial vaporization shall be prevented. Defendant says that the word vaporization means generation of vapor and that plaintiff's patent limits his process to one in which no vapor is generated in the initial tube or chamber where the heat is applied. Plaintiff says vaporization means liberation of vapors and that his patent provides for generation of vapor in the heating chamber and liberation in the second chamber. If plaintiff's interpretation is correct, defendant infringes. If, on the other hand, the term is to be given the meaning for which defendant contends, defendant does not infringe.

The generally accepted meaning of the word among scientists and the laity as well seems to be generation of vapor.[1]

[1] See Carhart, Physics for College Students (1910) p. 375; Spinney, A Text Book of Physics (1925) p. 196; Barker, Physics Advanced Course (1892) p. 309; Herring, Essentials of Physics for College Students (1912) p. 115; Shrader, Physics for Students of Applied Science (1937) pp. 198, 202; Norris, A Text Book of Inorganic Chemistry, (1921) p. 163; Ferry, General Physics and Its Ap-

It is true that a patentee in describing his invention and framing his claims is not bound by definitions given in dictionaries or scientific books. He may be his own lexicographer. Northwest Engineering Corp. v. Keystone Driller Co., 7 Cir., 70 F.2d 13. He is "at liberty to supply his own dictionary".[2] But if he uses a word in a sense other than that in which it is ordinarily used or is defined in dictionaries or scientific works, he must make clear the meaning he gives to the word. And if a word, as commonly accepted, has two or more meanings, the meaning he gives it must appear from the patent itself. Dennis et al v. Pitner et al., 7 Cir., 106 F.2d 142, 148. The requirement of the statute, R.S. § 4888, Title 35 U.S.C.A. § 33, that the inventor shall describe his invention in full, clear and exact terms is not met by terms capable of different constructions. In re Crowell, Cust. & Pat.App., 84 F.2d 206, 209. In determining the meaning one may search the whole patent, for, while the claims may not be broadened by the specifications, Libbey Glass Mfg. Co. v. Albert Pick Co., Inc., 7 Cir., 63 F.2d 469, Minerals Separation, Limited, v. Butte & Superior Mining Co., 250 U.S. 336, 347, 39 S.Ct. 496, 63 L.Ed. 1019, the specifications may be examined to determine what the inventor meant by the expressions used in his claims. Horton Mfg. Co. v. White Lily Mfg. Co., 7 Cir., 213 F. 471, 473. If upon examination of the whole patent it clearly appears that Dubbs used the term to mean liberation of vapor, the court must give it that meaning. Otherwise it must be given the usual and dictionary meaning.

On page 1 line 15 he says, "among the salient objects of the invention are to provide a process in which the oil is continuously fed through the *cracking zone* and thence through the *vapor zone* and a portion of the generated vapors condensed and returned to the inlet side of the cracking zone for further treatment." (Emphasis mine.)

Here there is nothing to indicate clearly whether he uses the term vapor zone to indicate generation or liberation of vapor, though possibly the reference to feeding the oil "through the vapor zone and a portion of the generated vapors, condensed and returned to the inlet side of the cracking zone" might indicate that he meant by "vapor zone" a place where vapor is generated.[3] Later describing the apparatus, page 1, line 52, he says, "B are the cracking tubes, C are the vaporizing tubes". Next, he gives a description of the process and states, page 1, line 75, that the charging stock is passed "through tubes B and during the time they (sic) are passing through said tubes, they are subject to sufficient heat to cause the desired amount of cracking". It will be noted that he does not say the desired amount of cracking occurs in the B tubes and from the whole patent it is clear that what he is attempting is to impart to the oil in the B tubes the heat that will cause it to crack in the C tubes.[4] "Said oil is then passed into the tubes C which are only partially filled with the oil and as the oil passes through these tubes there is a liberation of vapors from the same" (lines 79–83) and the vapors then pass up to the initial condenser. That Dubbs thought vapor was generated in the C tubes is indicated by his further statement, page 1, line 108, that the per cent of vapors *generated* from the oil as it *passes through the C tubes* will depend on the amount of heat acquired by said oil while passing through the B tubes. In one other passage of the patent, lines 28 to 32, page 2, he says, "It will be noted that the reflux condensate is in all cases trapped off from the vapor lines in such manner as to prevent their (sic) returning direct to the vaporizing tubes C" but nothing in the paragraph indicates whether he uses the word "vaporizing" to mean vapor generation or vapor liberation.

These are all the references to vaporization in the description of the invention as originally filed. In the claims in the

plication to Industry, (1921) p. 268; Encyclopaedia Brittanica, 14th ed. Vol. 22, p. 979; and Webster, Funk & Wagnall's Standard and Oxford Dictionaries.

[2] Jones v. Sykes Metal Lath & Roofing Co., 6 Cir., 254 F. 91, 96.

[3] There is confusion, too, in the use of the term "cracking zone". Here he is evidently referring to the B tubes, but he states that the carbon containing residue is continuously removed from the cracking zone, by which, of course, he means the C tubes. Page 1, line 22.

[4] Temperature and time are the essentials for "deep cracking", that is a cracking that will produce gasoline. The oil must be brought to the required temperature and kept at that temperature for a sufficient time.

original application no reference was made of prevention of vaporization in the B tubes and I am of the opinion that Dubbs had no clear idea of what happened in the B tubes and that he did not consider it important.

Plaintiff relies heavily on a description of an illustrative run in the application to sustain its theory that the term vaporization should be construed to mean liberation rather than generation of vapor. In this illustrative run Dubbs used crude oil of 32 to 36 Baume gravity and the 4 inch B coils are subjected to a temperature of 750° to 860° F. The heated oil then passes to the 10 inch C coils which are maintained about half full of oil "wherein vaporization takes place." A pressure of approximately 100 pounds to the square inch is maintained on the oil during treatment "which is caused by the generated vapors." It must be noted, however, that this description of the illustrative run was not in the original application but was inserted in the first amendment to the original application. The limitation of the process in the claims to one in which substantial vaporization is prevented in the B tubes was added in the third amendment filed more than two years later.

Dr. Brown, the expert called by plaintiff, testified at great length as to his understanding of the Dubbs specification and the performance of the process thereunder. He said:

"There is no separation of the liquid from the vapor or the vapors from the liquid in these tubes B ·

* * *

"I believe it is impossible to operate according to the principles set forth in the Dubbs patent and not obtain vapor generation in the B tubes."

Brown further testified that the illustrative run described in the Dubbs specification prescribed conditions under which the oil leaving the cracking tubes B would contain upwards of ninety per cent by weight of vapors generated within the oil. Separation of the generated vapors was prevented, he said, by the velocity of the passage of the oil through the B tubes, and he testified and plaintiff urges that the teaching of the patent with respect to this velocity was found in the showing of the hydrostatic head in the drainage system due to the elevation of the partial condenser, and the showing of the small number and the short length of the B tubes, which, for efficient heating of the oil, required that the oil should move through these small tubes with as much velocity as possible.

If, as seems implicit in this argument, the number and length of the B tubes was such as to require forcing the oil through at high velocity, and the height of the partial condenser was another element which helped to create the required velocity and this velocity was necessary to prevent "substantial vaporization" therein, the patent is wholly silent upon these critical factors of the invention.

Dr. Brown also relied upon a comparison of the claims originally presented in the Dubbs application with those finally allowed as indicating a recognition by Dubbs of generation of vapors (without liberation thereof) in the B tubes. Thus, claims 1 and 2 originally presented opened with these respective passages:

"Claim 1. A process of converting heavy into lighter hydrocarbons, consisting in passing the oil through a heating coil in a cracking zone, passing the oil and *generated vapors* into a vapor chamber, taking off the vapors from said vapor chamber, * * *

"Claim 2. A process of converting heavy into lighter hydrocarbons, consisting in passing the oil through a heating coil in a cracking zone, passing the oil and *generated vapors* into a vapor chamber, taking off the vapors from said vapor chamber, * * *"

But it should be noted that while in these two claims in the original application Dubbs spoke of passing the "oil and generated vapors" from the B to the C tubes, in the first amendment no mention was made in any claim of generation of vapors in the heating zone, but in each he referred simply to passing the oil through a zone of reaction, or a cracking zone or heating zone. In the second amendment ten of the claims provided for the passage of oil through a heated zone of reaction and thence to an enlarged chamber where vaporization takes place, the 11th provided for passing a stream of oil through a series of tubes seated in a cracking zone and the 12th for progressively passing the oil through a heated zone of reaction and then passing the *heated* oil through a vaporizing zone. Finally in the third amendment the claims were worded as they now stand, each claim containing a clause prohibiting

584

substantial vaporization in the B tubes. Never after the cancellation of the claims first filed was there any mention of vapor being generated in the B tubes.

■ Though we do not place our decision on the narrow ground that Dubbs barred himself (and plaintiff) by estoppel from now contending that his patent permits generation of vapors in the B tubes it does appear from the holding of the Supreme Court in Schriber-Schroth v. Cleveland Trust Co., 311 U.S. 211, 61 S. Ct. 235, 85 L.Ed. ——, that because of Dubbs cancellation of the first two claims of his original application plaintiff is in no position now to assert for the present claims the same scope as those of the claims cancelled.

■ I am forced to the conclusion that the patent does not show that Dubbs used the term vaporization in any other than the commonly accepted meaning of generation of vapor. As Judge Evans said in Colgate-Palmolive-Peet Co. et al. v. Lever Bros. Co., 7 Cir., 90 F.2d 178: "Restrictive words in a patent must be given their true meaning even though a worthy invention be thereby rendered valueless". And the true meaning of the word "vaporization" as used in this patent, it seems to me, is generation of vapors. Given this construction defendant's process does not infringe.

■ It still remains to consider the Egloff patent. In this process fuel oil may be heated to a temperature of 700° F. and subjected to a pressure of 135 pounds in a heating coil and delivered through an insulated transfer line to a large, cylindrical expansion chamber, the contents of which are subjected to the same pressure. There is a vapor outlet pipe through which the vapor passes to a condenser and the condensate is pumped back to a second heating coil where it is subjected to a pressure of 175 pounds and a temperature of 770° F. and from there it passes to the transfer line above mentioned through which the charging stock is passing from the coil in which it has been heated to the expansion chamber. While "on stream" therefore there is continually passing into the expansion chamber a stream composed of the fresh feed which has been subjected to a temperature of 700° F. and pressure of 135 pounds and the reflux condensate which has been reheated to a temperature of 770° F. and subjected to pressure of 175

pounds. But what benefit comes from this reheating of the reflux condensate and subjecting it to the pressure mentioned I cannot determine from the evidence. And it does not appear to have been ever used, commercially. Nor do I find anything involving invention. In my opinion this patent is invalid.

These same two patents were involved in a case in the District Court for the District of Delaware, Universal Oil Products Co. v. Winkler-Koch Engineering Co. et al., 6 F.Supp. 763. That court held the patents valid and infringed, and the judgment was affirmed by the Circuit Court of Appeals, Root Refining Co. v. Universal Oil Products Co., 3 Cir., 78 F.2d 991. It is with reluctance that I feel compelled to disagree, in part, with those courts.

The defendant is entitled to a decree dismissing plaintiff's bill of complaint.