## UNIVERSAL OIL PRODUCTS CO. v. GLOBE OIL & REFINING CO.
### No. 7912.

Circuit Court of Appeals, Seventh Circuit.

June 30, 1943.

A. F. Reichmann, of Chicago, Ill., Wm. F. Hall, of Washington, D. C., Walter J. Blenko, of Pittsburgh, Pa., and Chas. M. Thomas, of Washington, D. C., for appellant.

J. Bernhard Thiess, Thorly Von Holst, Sidney Neuman, and Robt. W. Poore, all of Chicago, Ill., for appellee.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Plaintiff brought suit on two patents, one to Carbon P. Dubbs, No. 1,392,629, issued October 4, 1921, and the other, No. 1,537,-593, issued to Gustav Egloff, May 12, 1925.

Defendant challenged the validity of both patents and denied infringement of either patent. It also vigorously contends that plaintiff's conduct necessitated a denial of all relief by a court of equity because of Dubbs' unethical conduct. It invokes the plaintiff's unclean hands as its third defense.

The court held the Dubbs patent to be valid, but not infringed, and declared the Egloff patent, invalid. As to the defense of unclean hands, the court reached the conclusion that "there was no conduct on the part of plaintiff proven in this case which should bar plaintiff from maintaining this action," etc.

While defendant insists that the Dubbs patent is invalid and that plaintiff was guilty of subornation of perjury in the interference suit which resulted in the allowance of the Dubbs patent, we will discuss only the question of infringement of the Dubbs patent. On this issue as to this patent we agree with the District Court. It is unnecessary therefore to decide the other two questions, so elaborately and ably argued by opposing counsel.

The District Court made careful and complete findings upon each issue and filed an excellent opinion on this vital question of noninfringement. We set forth in the margin extracts from this opinion.[1]

Counsel and the lower court both give more serious consideration to the Dubbs

---

[1] "In his process Dubbs treats crude oil while in the Burton and Burton-Clark stills only gas oil (a lighter oil obtained from crude petroleum by distillation) could be used. The material to be treated is pumped into a nest of 4 inch tubes known as B tubes and during the time it is passing through said tubes they are sub-

patent than to the Egloff patent. The latter might be described as an improvement over the former. The Dubbs patent is represented by nine process claims. Speaking from the application, it may be said:

"This invention relates to improvements in processes of converting hydrocarbons and refers more particularly to an improved form of cracking process of the continuous type. Among the salient objects of the invention are to provide a process in which the oil is continuously fed through the cracking zone and thence through the vapor zone, and a portion of the generated vapors condensed and returned to the inlet side of the cracking zone for further treatment; to provide a process of the character above referred to in which the carbon containing residue is continuously removed from the cracking zone while the reflux condensate is returned to the cracking zone for further treatment substantially free from carbon; to provide a process which permits of the apparatus being operated for an extended period without the necessity of cleaning and in which that part of the system containing the precipitated carbon, is free from subjection to any excessive heat; to provide a process in which the reflux condensate is continuously removed from the refluxing condensing apparatus and returned to the inlet side of the system; to provide a process in which the vapors not initially condensed are finally caused to pass through a single passage for a secondary condensing action and in general to provide an improved process and also a novel apparatus of the character referred to."

Claim 7 is a typical one, and reads:

"7. A process of cracking oil consisting in continuously passing a stream of oil through a series of tubes seated in a cracking zone where the oil is heated to the cracking temperature but substantial vaporization prevented, and thence to an enlarged vapor chamber where vaporization takes place, removing the vapors from said chamber, subjecting them to an initial condenser where a portion of the vapors are condensed, subjecting the uncondensed portion of the vapors to a final condensation, returning the condensate from said initial condensation to the inlet side of the cracking tubes and continuously drawing off the residue from the vapor chamber and preventing it from returning to the cracking zone and maintaining a pressure on the oil during treatment."

The so-called "cracking process" as applied to the gasoline production art was old when Dubbs entered the field. The chemists in the college laboratories had long previously made the discovery that heat applied to oil, crude and refined, resulted in the molecules' cracking. Out of this heating of the oils ultimately came gasoline. This fact information was old and well known in the trade engaged in gas production.

Likewise, and we here more nearly approach the art in which Dubbs worked, there had been variously devised apparatus to commercially practice that which had been taught in the chemist's laboratory. As in many instances there was a giant step from the teachings of the laboratory to the production of gasoline by cracking on a

---

jected to sufficient heat to cause the desired amount of cracking. The oil is then passed into ten inch tubes designated as C tubes where vapor is liberated. This liberated vapor passes to an aerial condenser. The uncondensed vapor is passed on to other condensers. The vapor condensed in the aerial condenser is returned by gravity to the heating zone where, with the fresh feed, it is again subjected to cracking temperature. The residue in the C tubes is continually drawn off from those tubes. Pressure is maintained throughout the apparatus by means of a regulating valve. * * *

"Defendant's process is essentially as follows: A fairly clean distillate is fed in a stream to cracking coils and subjected to temperatures up to 940° F. and pressures of 500 pounds. As this stream leaves the cracking coils, it is passed through a valve by which the pressure is reduced to 26 pounds. Then a second stream is conducted into the first, this second stream consisting of topped crude oil from a low pressure furnace. The merged stream is conducted into a 'vaporizing chamber' (as plaintiff calls it) or 'vapor separator' (as defendant calls it) where the vapors from the cracked stream pass out through the top into a bubble tower where partial condensation takes place, and from the top of which the vapors pass to a final condenser. The liquid residue which collects in the bottom of the vaporizing chamber, to use plaintiff's terminology, is drawn off and run to storage facilities. This residue is never re-cycled through the cracking tubes. The reflux liquefied in the bubble tower is re-cycled through the cracking tubes." [40 F.Supp. 575, 577.]

commercial basis. It was a step so necessary and yet hard to take, where theory was converted into the practical, where a scientific discovery became a usable commercial process.

The need for gasoline was great. Yet there was a maximum price beyond which the producer could hardly go. The production of more gas from the given amount of crude oil was desirable, but only if the price at which it was produced made its use possible. The task therefore was to devise a means whereby more gasoline could be produced by the cracking process and the cost thereof kept down through production on a large scale basis. Large were the inducements for success and numerous were the operators in the field. Many different kinds of apparatus were devised and many were in use. Success was a relative term. The fact significant to us is that the field was far from a virgin one when Dubbs entered. It was more completely occupied when Egloff approached it, viewed it, and then entered it.

The practice common to all was to use large retainers, apply heat as economically as possible and keep the oil continuously moving in pipes of sizes, shape, turns, etc., as the designer deemed wisest.

The District Court described the first commercially successful process devised by Dr. Burton in 1912 so well that we quote therefrom:

"Petroleum as it comes from the ground contains a variety of compounds composed of hydro carbon molecules, the various molecules being composed of atoms of hydrogen and carbon differently arranged and with differing numbers of carbon and hydrogen atoms. Many years ago it was discovered that by the application of heat some of these molecules could be broken up, some of the heavier carbon atoms separated from lighter hydrogen atoms and a lighter oil having a lower boiling point was produced. This process is known in the art as 'cracking'.

"With the development and increased use of the internal combustion engine came a greatly increased demand for the lighter oil known as gasoline. This fluid was recoverable from crude petroleum by a simple process of distillation and this method had been used for years, but the amount so produced was insufficient to meet the needs of modern industry. It was known that gasoline could be produced from the heavier oils by cracking and various inventors had been exploring the possibilities of so producing gasoline in commercial quantities.

"The first practical process, the first that met with commercial success, was devised by Dr. Burton and put into operation during the year 1912. In his process about 8,250 gallons of a light oil which had theretofore been obtained from crude petroleum by distillation was put into a shell eight feet in diameter and thirty-two feet long. From that shell two vapor lines, each about 12 inches in diameter and 35 feet long led to a condenser. A fire was built under the shell and the liquid therein heated to a temperature of from 700° F. to 750° F. and became subject to autogenous pressure of about 75 pounds from the vapors and noncondensible gases produced by the heating. This temperature and pressure were maintained throughout the operation. The vapors generated passed up through the vapor tubes where they were subjected to partial condensation. The portion of the vapor condensed, termed reflux condensate, returned through the long vapor line to the shell where it was subjected to further cracking. The uncondensed vapor was passed on from the partial condensation chamber for further processing.

"About twelve hours were required to bring the contents of the shell to the proper temperature and pressure, to bring the still 'on stream'. It remained 'on stream' about 24 hours when it became necessary to draw the fires and withdraw the oil remaining in the still and remove the carbonaceous material which had been released during the operation and had adhered to the inner wall. This required about 12 hours.

"This method had several disadvantages. A still could be 'on stream' only about 24 out of every 48 hours. Only about 28% of the total charge was recoverable as gasoline. The 'on stream' period was necessarily limited to 24 hours because experience had shown that the carbonaceous material accumulating on the bottom of the shell retarded the absorption of the heat by the oil, and caused 'hot spots' to appear on the shell. If the 'on stream' period were extended an explosion was likely to occur at these 'hot spots' with serious danger to the life of those operating the still and great property damage as well. Several such explosions had occurred."

Determination of the issue of infringement in the District Court turned largely upon the meaning of the language of one

step of the claim—"but substantial *vaporization prevented.*" Appellant contends that the District Court erred because it failed to give the proper definition to the word "vaporization," as here used.

■ Plaintiff's right to define the terms used in its patent is clear. Its language and its meaning of the words selected, govern. This is the generally accepted view of the courts, including this court, in construing the language used by the inventor in describing his invention. Dennis v. Pitner, 7 Cir., 106 F.2d 142; Northwest Eng. Co. v. Keystone Driller Co., 7 Cir., 70 F.2d 13; Rajah Auto Co. v. Belvidere Co., 7 Cir., 275 F. 761; Advance-Rumley Co. v. John Lauson Co., 7 Cir., 275 F. 249.

■ Equally clear is the rule that words will be given their ordinary and accustomed meaning unless it appears that the inventor used them differently. Moreover, the meaning which the inventor gives to his words can not be made to depend upon subsequent events, but should appear when the application is filed. For example, an applicant who used words of common meaning and finds they do not cover a subsequently created structure will not be permitted to place a new or different meaning that will cover said subsequently appearing structure. The District Court believed this was what Dubbs tried to do in this case. He tried to give a new meaning to the word "vaporization" in order to cover the defendant's structure after it became apparent that the ordinary meaning of the language of the patent would not cover defendant's structure.

■ The word "vaporization" is not difficult of definition. Even in the absence of authority, it would seem clear that it was the act of vaporizing. Only one meaning would ordinarily be given to the expression "but substantial vaporization *prevented.*" Dictionaries, lexicographers, and textbooks[2] have, however, defined the term and always in harmony with that general meaning of "act' of vaporizing." Webster says:

"Act or process of vaporizing, or state of being vaporized; artificial formation of vapor; specif., conversion of water into steam, as in a steam boiler."

Funk & Wagnall states the definition:
"The act or process of vaporizing, or the state of being vaporized."

Encyclopaedia Britannica:
"Vaporization, a general term denoting the change of state of any substance from solid or liquid to vapour."

Columbia Encyclopedia:
"Vaporization is concerned with the change of a substance into a gas or vapor."

Oxford Dictionary:
"The action or process of converting, or of being converted, into vapour."

The Encyclopaedic Dictionary:
"Vaporization, The act or process of vaporizing; the artificial formation of vapour; the state of being vaporized."

The Century Dictionary and Cyclopedia:
"Vaporization. The act or process of vaporizing; the formation of vapor, or the state of being converted into vapor; treatment with vapor."

■ We are satisfied to adopt that part of Judge Holly's opinion (40 F.Supp. 581) which deals with infringement of the Dubbs patent. It so fully and satisfactorily states and disposes of this issue that we believe further discussion unnecessary and inappropriate. We will confine ourselves to briefly stating added reasons for the conclusion thus reached.

■ In appraising Dubbs' invention and assuming its validity, there are several factors which need be stressed in defining its limitations.

· (a) The claims of plaintiff's patent, not his invention, or what is now claimed to be his invention, govern.

(b) The claims cover a process—not a product. Confusion may be avoided by keeping in mind the steps described which can not be liberalized or helped by the drawings of an apparatus and which might have been the basis of product claims.

(c) The art here involved was built upon an established scientific fact, well known

---

[2] Carhart, Physics for College Students, p. 375; Spinney, A Textbook of Physics, p. 196; Barker, Physics, Advanced Course, p. 309; Herring, Essentials of Physics for College Students, p. 115; Shrader, Physics for Students of Applied Science, pp. 198, 202; Norris, A Textbook of Inorganic Chemistry, p. 163; Ferry, General Physics and Its Application to Industry, p. 268; Encyclopaedia Britannica, Vol. 22, p. 979; First Principles of Physical Science, Wells, p. 194; Atkinson, Elementary Treatise on Physics, p. 278; Reed, College Physics, p. 240; Coleman, The Elements of Physics, p. 192; Anderson, Mechanics and Heat, p. 260; Walker, Principles of Chemical Engineering, p. 381, 478.

long prior to the time Dubbs entered the field, namely, that heat would crack molecules of oil. The field of discovery was well occupied. It was limited to processes, whereby heat was applied to moving oil, which would more economically and safely produce gasoline. At best the invention was in the nature of an improvement and the language of the claims should be construed accordingly.

(d) The word "prevented" in the phrase "by substantial vaporization prevented" is significant. Even though the word be used relatively rather than absolutely, it is, we think, highly significant in comparing defendant's process and apparatus with plaintiff's. It points to the heart of a vital step in the Dubbs process. In defendant's process, accuracy would require a description which said, instead of "prevented," there was an encouragement, or at least no prevention, of vaporization. And this is so no matter what meaning is given to the word "vaporization."

In construing a process claim, attention is directed to the verb. It described the step. In this case the verb is "prevent." What is "prevented"? Vaporization.

Even if we accept plaintiff's definition of vaporization, still defendant did not provide an apparatus that *prevents* substantial vaporization. The apparatus used by both parties calls for what the expert witnesses termed tubes (called by counsel, cracking (B) tubes and vaporization (C) tubes). Plaintiff heats its oil in B tubes to the cracking temperature. Its oil then passes to the mildly or unheated C tube where vaporization as plaintiff defines that term, occurs. In defendant's apparatus, the oil is cracked and vaporized in what might be called its B tubes, and this is so whether we accept plaintiff's or defendant's definition of vaporization.

Avoidance of this conclusion is possible only by finding the tubes which defendant called its B tubes are C tubes. We are not justified in so doing. The claims do not describe the tubes as B or C tubes. The claim is for a process and therefore we have steps described. The actions which are stated in the separate steps constitute the claim. Thus Dubbs describes one step as heating oil to the cracking temperature. He then modifies this by adding the all important phrase (without which the Patent Office rejection would have stood) "but substantial vaporization prevented." This action he accomplished (although he does not say so in his claim) by the use of different sized tubes and the application of heat and its withdrawal when the cracking point is reached.

Now the evidence is that oil can not be heated to the cracking point, which is different in different oils, without vaporization and in thus speaking, we accept plaintiff's definition of vaporization. But defendant's apparatus and its process not only heat to cracking point, but heat to a point where cracking and vaporization take place. In other words "substantial vaporization prevented," is the action which is the heart of this step of plaintiff's process, while defendant heats its oil to the cracking point, but does not stop there, making no effort to *prevent* vaporization.

*Egloff patent.* The District Court held this patent was invalid.

Defendant asserts it is a paper patent, has never been used, and in several respects lacks in inventive attributes.

We are not much impressed by the charge that it is a mere paper patent or that it has never been used. If merit lies in it, validity cannot be refused because of lack of use. Boycott by users or lack of means of the inventor sometimes accounts for the non-use of an invention. Moreover, it may get into hands not interested in exploiting it. The questions for decision are: What are the merits of the invention? and Does the patent fully and correctly describe the invention?

We are persuaded that defendant did not infringe the claims of this patent. When Egloff entered the field it was less open than when Dubbs made his entrance. True, there is always room for one more and happily no art is ever closed. Unoccupied places may become narrower, but the inventor's contribution may be, and often is, just as outstanding and just as important and valuable as it would be if the field were a virgin one, and the invention the first to appear. In fact an invention in a crowded art may be like a fertilizer on exhausted soil. It gives new life to a dying industry.

On this phase of the case we are not adopting the District Court's opinion, nor are we disapproving of it. We rather choose to place our conclusion on the ground that there was no infringement. We can not escape the conclusion that Egloff was dealing with a decidedly different problem. Like Dubbs, his drawings and specifications both suggest a product patent. He says his invention relates to improve-

8

ment in process and *apparatus* for cracking oil. Although he thus refers to apparatus, his claims do not support his reference. No apparatus is described. The drawings, however, help us to understand what Egloff was doing.

Even assuming validity, it is apparent that the Egloff process is at most a narrow patent limited strictly to the steps described. It is infringed only when such steps are taken as described. Defendant not only proceeds differently by its process but the differences are both additions and elimination of steps. We think elaborate discussion here would be of no interest to anyone save the parties. As to them we say, defendant, in its brief, has pointed out the distinctions between its process and the claims of the patent. Far from showing infringement, we think the record affirmatively and clearly shows, defendant's structure is far out of the reach of Egloff's disclosure. And in saying this we give considerable stretch to the disclosure of Egloff.

The decree is affirmed.

LINDLEY, District Judge, agrees that the judgment should be affirmed. He is of the opinion, however, that affirmance should be on the ground that the Dubbs patent in suit was invalid because the prior art patents showed anticipation. He is also of the opinion that if the Dubbs patent is valid, it is infringed by the Globe Oil & Refining Company process. As to the Egloff patent he is of the opinion that the same is invalid.