Maurice KATZ and Samurai, Plaintiffs,

v.

AIWA AMERICA, INC., the Wiz Distributors, Ltd., Nobody Beats the Wiz, Inc., et al., Defendants.

Civ. A. No. 92–1360.

United States District Court, D. New Jersey.

March 12, 1993.

Polachek, Saulsbury & Hough by William
T. Hough, Basking Ridge, NJ, for plaintiffs.

Lerner, David, Littenberg, Krumholz &
Mentlik by Lawrence I. Lerner and Arnold
B. Dompieri, Westfield, NJ, for defendants.

Piliero & Goldstein by Robert D. Piliero,
Carlstadt, NJ, for defendants.

OPINION

HAROLD A. ACKERMAN, District
Judge:

Plaintiffs Maurice Katz ("Katz") and Sa-
murai Products, Inc. ("Samurai") brought
this action against defendants AIWA Amer-
ica, Inc., The Wiz Distributors, Ltd., and
Nobody Beats The Wiz, Inc., et al. (collec-
tively "AIWA") alleging patent infringement
and unfair competition. Before me now are
1) AIWA's motion for summary judgment of
non-infringement, both with respect to the
complaint and its counterclaim, and for an
award of attorneys' fees and costs, or in the
alternative, for judgment on the pleadings on
plaintiffs' count for unfair competition and 2)

Katz's cross-motion for sanctions against
AIWA and AIWA's counsel.

Oral arguments on these motions were
heard on April 8, 1993. For the following
reasons, AIWA's motion for summary judg-
ment of non-infringement is granted but its
request for attorneys' fees and costs is de-
nied. Katz's cross-motion for sanctions is
also denied.

I. Factual Background

On March 31, 1992, plaintiffs filed a com-
plaint against AIWA alleging patent infringe-
ment and unfair competition, requesting
money damages, injunctive relief, and attor-
neys' fees. AIWA's counterclaim seeks, *in-
ter alia,* a declaratory judgment that AIWA's
products do not infringe any valid claim of
plaintiff Katz's patent and an award of attor-
neys' fees and costs, as well as sanctions
pursuant to 35 U.S.C. § 285, 28 U.S.C.
§ 1927 and Rule 11 against plaintiffs.

The following are the undisputed facts.

A. *The Katz Patent*

Plaintiff Katz is the exclusive owner of
United States Letters Patent No. 4,678,874
("'874 patent" or "Katz patent"), a utility
patent for an anti-burglary device for auto-
mobile radios and cassette players ("play-
ers").[1] Katz filed an application for a patent
on April 3, 1986 and the patent issued on
July 7, 1987. The patent contains fourteen
claims, two of which, claims 1 and 8, are
independent. Each of the independent
claims recites as elements or limitations of
the invention: 1) a "lever means" and 2) a
"dial-type combination lock means for secur-
ing and unsecuring said lever means."
Claim 1 reads in pertinent part:

An anti-burglary device comprising in com-
bination: a dashboard-mountable audio
electronic means for an electronic audio
function including reproducing cassette or
radio audio sound, said audio electronic
means including audio elements adapted to
reproduce audio sound; a lever means for
intermittent alternate switching from an
inoperative position for said electronic
function to an alternate operative position

1. Plaintiff Samurai is a non-exclusive licensee of this patent.

required to achieve said electronic function, said lever means including an interior inaccessible portion connected to an accessible exterior manual manipulation portion arranged to make possible manual movement of the interior inaccessible portion; a dial-type combination lock means for securing and unsecuring said lever means at said inoperative position at which said electronic function cannot be achieved, said dial-type lock means having locking elements having dials adapted for dialing said locking means to and from alternate unlocked and locked positions, said dial-type lock means being additionally for manual movement alternately from and to release and securing of the lever means in said inoperative position when said dials have been dialed to said unlocked position; . . . .

'874 patent at Col. 7, lines 27–49. Claim 8 contains essentially the same recitation and recites elements in addition to those recited in Claim 1, including "a key-receiving structure" and "a blocking-key means." *Id.* at Col. 9, lines 1–4; 14–36.

### B. *AIWA's Products*

AIWA sells automobile radio/cassette players having a security system to discourage theft. AIWA's products falling into this category at any time since the Katz patent was issued are Model Nos. CT–X7000, CT–X8000, CT–X6, and CT–X8 ("AIWA products"). The security system for all of these products uses the player's microcomputer, random access memory (RAM), display screen, preset station buttons and several other operational buttons.

A user activates the security system for the first time by pressing certain operational buttons on the player's front panel. This causes the microcomputer to enter into a "stand-by" mode during which the microcomputer is able to receive a four-digit security code, selected by the user. Operation of the player is inhibited during the stand-by mode because the microcomputer withholds the electrical command and control signals necessary for the player's operation. During stand-by, the microcomputer responds only to the transmission of the security code. The user transmits the security code to the microcomputer by pressing the player's pre-

set station buttons which causes the transmission of electrical signals, representative of the code, to the microcomputer. The microcomputer displays the code on the display screen and also simultaneously stores it in its RAM.

Once the code has been entered, the microcomputer leaves the stand-by mode and enters a mode in which it provides normal command and control signals. If the user then presses one of the player's operational buttons, the microcomputer responds by transmitting the appropriate electrical signals to effect the selected operation.

After activating the security system, the player operates normally unless it is disconnected from its power supply. When the player is subsequently reconnected to the power supply, the microcomputer enters the stand-by mode in which operation of the player is inhibited until the security code is retransmitted to the microcomputer.

The security code is reentered into the player by pressing the preset station buttons in the same manner in which the code was originally programmed into the player. The microcomputer electronically compares the transmitted code with the code stored in the RAM and, if a match exists, the player becomes operational.

## II. Discussion

### A. *Standard for Summary Judgment*

■ Summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dism'd,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.,* 843 F.2d

139, 143 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248, 106 S.Ct. at 2510.

■ Within the framework set out above, the moving party essentially bears two burdens. First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating that there is no genuine issue of fact and that as a matter of law, the moving party must prevail, or by demonstrating that the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970); Advisory Committee's Notes on Fed.Rule of Civ.Proc. 56(e), 1963 Amendment; *see generally* C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (2d ed. 1983).

■ With respect to patent cases, the Federal Circuit[2] has stated that:

> Summary judgment is as appropriate in a patent case as in any other. Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed.R.Civ.P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources.

*Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984). The Federal Circuit has affirmed grants of summary judgment in patent cases on numerous occasions. *See id.* (citing cases); *see also Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384 (Fed.Cir. 1992); *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792 (Fed.Cir.1990).[3]

### B. Standard for Patent Infringement

■ A "claim" set forth in a patent "provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257 (Fed.Cir.1989) (*citing Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950)). As the Federal Circuit has explained:

> The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. It is to these wordings that one

**2.** A district court exercising jurisdiction under the Patent Act is bound by the law of the Federal Circuit. *See Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1573 (Fed.Cir.1984).

**3.** Katz argues preliminarily that AIWA's motion must be dismissed for the reason that the pleadings have not been closed in this action because AIWA filed and served its motion concurrently with the filing and service of its amended counterclaim. Katz's argument is without merit. Fed.R.Civ.P. 56(b) provides that "[a] party against whom a claim, counterclaim or cross-claim is asserted ... may, *at any time,* move ... for a summary judgment in the party's favor as

to all or any part thereof." (emphasis added). AIWA's motion for summary judgment with respect to the complaint, therefore, is not premature. Fed.R.Civ.P. 56(a) provides that "a party seeking to recover upon a claim, counterclaim or cross-claim ... may, *at any time after expiration of 20 days from the commencement of the action* ... move ... for a summary judgment in the party's favor upon all or any part thereof." (emphasis added). This action was commenced on March 31, 1992. AIWA's motion for summary judgment on its counterclaim, filed December 7, 1992, is therefore not premature.

must look to determine whether there has been infringement.

*Id.* (*quoting Autogiro Co. of America v. United States,* 384 F.2d 391, 395–96, 181 Ct.Cl. 55 (1967)). The claims of a patent describe the invention by a series of limiting words or phrases known as "limitations." *Id.*

■ Determining whether there has been an infringement of a patent involves a two-step process. *Becton,* 922 F.2d at 796. First, the language of the claim must be interpreted. *Id; Corning,* 868 F.2d at 1258. In interpreting a claim, the court is to consider three sources: the language of the claims, the specification and the prosecution history. *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991). "Words in a claim 'will be given their ordinary and accustomed meaning, unless it appears that the inventor used them differently." *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed.Cir. 1984) (*quoting Universal Oil Prods. Co. v. Globe Oil & Refining Co.,* 137 F.2d 3, 6 (7th Cir.1943), *aff'd,* 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944)). Interpretation of a claim is generally a question of law that may be resolved by the court on a summary judgment motion. *Intellicall,* 952 F.2d at 1387; *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1580 (Fed.Cir.1989).[4] Second, the words of the claim, as interpreted, must be "read on," that is, applied to the "accused device" to determine whether there has been infringement. *Becton,* 922 F.2d at 796; *Corning,* 868 F.2d at 1258. The burden of proving infringement is on the owner of the patent. *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991); *Under Sea Indus., Inc. v. Dacor Corp.,* 833 F.2d 1551, 1557 (Fed.Cir. 1987).

■ Patent infringement may be found in either of two ways: by literal infringement or under the doctrine of equivalents. Literal infringement is found where every limitation of the claim is found in the accused device literally. *See SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 859 F.2d 878, 889 (Fed.Cir.1988). In the absence of literal infringement, a product may nevertheless be found to infringe a patented product if it is found to be its substantial equivalent.

■ To establish infringement of a patent in either of the two ways, every limitation or element set forth in a claim must be present in the accused device, either exactly or by a substantial equivalent. *Becton,* 922 F.2d at 796; *Corning,* 868 F.2d at 1258. In other words, "each element of a claim is material and essential ... and in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991) (*quoting Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985)). If any one or more limitations of a claim is missing from the accused device, there can be no infringement as a matter of law. *Id.* at 1539. In addition, if an accused device is found not to infringe an independent claim of the patented device, then, it must also be found not to infringe any claim dependent on the independent claim. *See Wahpeton Canvas Co. v. Frontier, Inc.,* 870 F.2d 1546, 1552 n. 9 (Fed.Cir. 1989) ("One who does not infringe an independent claim cannot infringe on a claim dependent on (and thus containing all the limitations of) that claim.").

### C. *Application of Standard*

#### 1. Interpretation of the Claims

■ Claim 1 recites the following as one of the elements of the invention:

a lever means for intermittent alternate switching from an inoperative position for said electronic function to an alternate operative position required to achieve said electronic function, said lever means including an interior inaccessible portion connected to an accessible exterior manual manipulation portion arranged to make possible manual movement of the interior inaccessible portion....

---

4. A disputed issue of fact may arise in connection with the interpretation of a claim where "there is a genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation." *Johnston,* 885 F.2d at 1579. Mere disagreement over the meaning of a term does not in itself create an issue of fact. *Id.*

Claim 8 contains the identical recitation and recites additional structures.

The plain, ordinary meaning of these words is a structure that is mechanical in nature, which extends from the exterior of the device to its interior. Manual manipulation of the exterior portion of the structure results in movement of the interior inaccessible portion between two positions. One position prevents the player's operation; the second position permits operation.

Claim 1 also recites as an element of the invention

> a dial-type combination lock means for securing and unsecuring said lever means at said inoperative position at which said electronic function cannot be achieved, said dial-type lock means having locking elements having dials adapted for dialing said locking means to and from alternate unlocked and locked positions, said dial-type lock means being additionally for manual movement alternately from and to release and securing of the lever means in said inoperative position when said dials have been dialed to said unlocked position; ....

Claim 8 contains the identical recitation and cites additional structures. The ordinary meaning of this recitation is a conventional, mechanical, manually manipulated, combination-lock.

This construction is consistent with the patent's specification. The specification describes a mechanism by which the player is inoperative "in one position and state of its control levers ... and operative in an alternate position and state of its control levers...." '874 patent at Col. 1, lines 51–54. The specification also states that the term "lever" is intended "to encompass an equivalent rotary shaft and/or knob thereof and gears." *Id.* at Col. 2, lines 35–37.

With regard to the second element, the specification explicitly refers to the lock as a combination "mechanical" lock, *id.* at Col. 7 line 6, and attempts to distinguish the lock from other types of locks as follows:

> While other locks such as key-actuated locks and/or computer-card locks of the like might ordinarily be considered to be

mechanical equivalents or otherwise equivalents to a combination mechanical lock of this invnetion [sic], such is not the case for the present invention, *the combination being critically the only type lock that is employable,* because it is not readily possible to bypass such a lock. On the other hand, a key actuated lock can normally be easily and rapidly picked. A computer-card that is inserted to actuated circuits often can be bypassed by manually fouling the card reading circuitry inside the card-insertion slot, to cause a fouling of electrical circuits or the like which would serve to effectively bypass the lock, causing release of the blocked lever and/or gear thereof.

> Thus, for the present invention, *there is no substitute for the combination lock, because to do so would defeat the utility of the invention.*

*Id.* at Col. 7, lines 3–21 (emphasis added).

The prosecution history also indicates that Katz intended and the Patent Examiner understood the device to be a *mechanical* structure whereby manual manipulation of an exterior portion resulted in movement of an interior portion that would render the player operable. For example, after Katz filed his patent application, but before the Examiner had acted on the application, Katz filed a "Petition to Make Special," which brought to the Patent Examiner's attention those patents Katz deemed to be the closest prior art.[5] In his petition, Katz distinguished this prior art from his own claim. For example, one such prior art patent was U.S. Patent No. 4,481,512 ("Tscheulin, et al."), which discloses a digitally-controlled and microprocessor-based audio system that is rendered electronically inoperable upon removal of the device's detachable front panel. In distinguishing Tscheulin, Katz stated:

> Tscheulin et al.—discloses complicated electronic digital-controlled and microprocessor controlled unit and user-interface unit, in no way resembling the elements of the present invention, having no manual lever for moving to and from inoperative positions, no dial combination lock, nor

5. Prior art is subject matter that is already in the public domain.

male locking key nor key-receiving element, etc.

*See* Petition to Make Special, dated July 2, 1986. Thus, the Examiner understood the nature of the invention to be mechanical, rather than electronic or microprocessor-controlled. Katz made similar arguments to distinguish two other patents for car radio security systems, U.S. Patent No. 4,248,069 ("Burbank") and U.S. Patent No. 4,081,751 ("Maddloni"), describing both references as "in no way resembling" his invention because they did not disclose any "manual lever," "dial combination lock," "male locking key," or "key-receiving element." *See id.*

In light of these statements, the Examiner applied U.S. Patent No. 3,774,049 ("Coleman"), which discloses an anti-theft device for an automobile's ignition comprising, according to the Examiner, "a dial lock device which allows the electronic device to be operable. The device ... includes a plurality dials [sic] to be turned to a correct unlocking position. In the correct position of the dials the electronic device is operable. The electronic device is held to comprise a lever means 1 which includes a manual manipulation device, held to be the key operated device...." Official Action, at 7. The Examiner therefore rejected Katz's original Claim 1 [6] on the ground that it was anticipated by the Coleman device.

In response, Katz amended his claims and cancelled his original claim 1, which he described in his Remarks as "too broad." [7] *See*

Amendment and Arguments, dated Jan. 8, 1987. Katz incorporated the subject matter of Claim 1 into a new claim and added additional features. For example, the new claim added that the "lever means includ[es] an interior inaccessible portion connected to an accessible exterior manual manipulation portion arranged to make possible manual movement of the interior inaccessible portion...." *Id.* This claim became Claim 1 in the patent as issued.

Katz argues for broad interpretation of the claim language, referring to a portion of the specification and to the remarks he submitted to the Patent Office following initial rejection of his patent application ("Remarks"). The specification states in part:

> While the present invention can be utilized with an off and on switch, the preferred embodiment utilizes a lever and/or equivalent control (such as buttons) that control volume or some other equally critical function....

'874 patent at Col. 2, lines 50–53.

In his Remarks, Katz stated:

> Additionally, it is clearly within the scope of the invention that the dials could optionally be push-button dials for electronically-dialing a combination lock—such being conventional in current-day technology and at the time of the filing of the application—but again not being the essence of the invention.

---

6. Katz's Claim 1, as originally filed, reads as follows:

 An anti-burglary device comprising in combination: an electronic means for an electronic function, said electronic means including a lever means including a manual manipulation portion arranged such that movement of the lever means from an inoperative position for said elecctronic [sic] function to an alternate operative position and state is possible and is required in order to achieve said electronic function; a dial-type combination lock means for securing and unsecuring said lever means in said inoperative position and state at which said electronic function cannot be achieved, said lock means having dials adapted to dail [sic] mechanism to and from alternate unlocked and locked states of being; and enclosure means including mounting structure, for structurally substantially totally enclosing each of said electronic means and said lock means

such that enclosed elements are inaccessible from exterior space and for mounting onto structure of an automobile dashboard, said dials and said manipulation portion each being accessible from an exterior of said enclosure means and the lock means being adapted for manual release and securing of the lever means from said inoperative position and state.

 *See* Application, filed April 3, 1986. Claim 1 was the only independent claim in the original application.

7. Although Katz now argues that the amendment was not intended to restrict the scope of the claims or to overcome prior art, but was intended to overcome the Examiner's rejection of the claims on the ground of indefiniteness, this contention is belied by his own statements to the Examiner.

Amendment and Arguments, dated Jan. 8, 1987.

■ Katz's argument is misplaced. It is the claims of the patent, not the specification that control. Katz, in essence, is attempting to avoid the precise limitations embodied in his claims. As the Federal Circuit has stated,

> The statute requires that an inventor particularly point out and distinctly claim the subject matter of his invention.... It would run counter to this statutory provision for an applicant for patent to expressly state throughout his specification and in his claims that his invention includes ... [a particular element] and then be allowed to avoid that claim limitation in a later infringement suit by pointing to one paragraph in his specification stating an alternative that lacks that limitation, and thus interpret the claim contrary to its plain meaning. Such a result would encourage an applicant to escape examination by filing narrow claims and then, after grant, asserting a broader scope of the claims based on a statement in the specification of an alternative never presented in the claims for examination.

*Unique Concepts,* 939 F.2d at 1562. "Inherent in our claim-based patent system is ... the principle that the protected invention is what the claims say it is...." *Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1457 (Fed.Cir.1991). In other words, "claims are infringed, not specifications." *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1121 (Fed.Cir.1985); *see also Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 957 (Fed.Cir.1983) ("That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims."), *cert. denied,* 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984).[8] This analysis applies all the more to remarks made by the patentee during prosecution of the patent which are not at all embodied in the patent.

**2. Literal Infringement**

It is undisputed that AIWA's products do not contain any mechanical "lever means" as disclosed in the Katz patent. Rather, AIWA's security system is completely electronic and controlled by a microcomputer. No lever or any other mechanical structure is used to prohibit actuation or movement of any of the player's mechanical components.

It is also undisputed that AIWA's products do not contain any "dial-type combination lock means." Rather, the disabling means on AIWA's products is the player's microcomputer, rather than a mechanical lock. In the standby mode, the microcomputer disables the player by withholding electrical signals necessary for the player's operation.

Katz has presented no evidence to establish that the limitations of his claims were met literally. Thus, there is no dispute as to any genuine issue of material fact as to whether AIWA's products literally infringe claims 1 and 8. Because all the remaining claims of the patent, *i.e.,* claims 2 through 7, and 9 through 14, are dependent on claims 1 and 8, respectively, AIWA's products do not infringe on those claims either. *See Wahpeton,* 870 F.2d at 1552 n. 9.

**3. Infringement under the Doctrine of Equivalents**

■ As discussed above, where the accused device does not literally infringe a claim, there may still be infringement under the "doctrine of equivalents." *See Becton,* 922 F.2d at 797. Under this doctrine, an accused product may infringe a claim "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856. The doctrine of equivalents "has been 'judicially devised to do equity' in situations where there is no literal infringement but liability is nevertheless appropriate to prevent what is in essence a pirating of the patentee's invention." *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870 (Fed.Cir.

---

**8.** "It is also well established that subject matter disclosed but not claimed in a patent application is dedicated to the public." *Unique Concepts,* 939 F.2d at 1563 (*citing Edward Miller & Co. v. Bridgeport Brass Co.,* 104 U.S. (14 Otto) 350, 26

L.Ed. 783 (1881)). Thus, Katz's disclosure in his Remarks regarding an option for "push-button dials for electronically-dialing a combination lock," which was not claimed in the patent, would be deemed dedicated to the public.

1985). "Thus, where an infringer, instead of inventing around a patent by making a substantial change, merely makes an insubstantial change, essentially misappropriating or even 'stealing' the patented invention, infringement may lie under the doctrine of equivalents." *London,* 946 F.2d at 1538.

■ As with literal infringement, infringement by equivalents must be applied on an element by element basis. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935 (Fed.Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988) and 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988). "Only if *all* limitations of the claim are satisfied at least equivalently can it be found that the two devices work 'in substantially the same way.'" *Becton,* 922 F.2d at 798 (emphasis added); *see also Intellicall,* 952 F.2d at 1389 (view that infringement may be found where accused device is equivalent "overall" to claimed invention rejected by Federal Circuit).

■ The doctrine of equivalents is also limited by two policy-oriented limitations, to be applied as a question of law. *Loctite,* 781 F.2d at 870. First, the doctrine of equivalents does not apply to an accused device that is already in the public domain, that is, a device that is found in the prior art at the time the patent was issued. *Id.; see also Wilson Sporting Goods Co. v. David Geoffrey & Assoc.,* 904 F.2d 677, 683 (Fed. Cir.1990) ("no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art."), *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). Second, the doctrine of equivalents cannot be applied in such a way as to allow the patentee to recapture coverage given up during the prosecution of the claim. *Id.* This second limitation is known as "prosecution history estoppel" or "file wrapper estoppel."

■ As discussed above, it is undisputed that AIWA's products are enabled and disabled electronically by means of a microcomputer. In contrast, Katz's product is enabled and disabled mechanically by use of a "lever means" and a "dial-type combination lock means." Moreover, the microcomputer does not prohibit mechanical manipulation of any component or structure in the player. With respect to Katz's product, in contrast, manual manipulation of an exterior structure results in movement of an interior portion. Thus, although both devices may achieve substantially the same *result,* they do not do so by performing substantially the same *function* in substantially the same *manner.* "To be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed." *Pennwalt,* 833 F.2d at 935 (*quoting Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528 (Fed.Cir.1987)).

■ As noted above, the burden of demonstrating infringement is on the patentee. Here, Katz had the burden of proffering evidence on this summary judgment motion that the AIWA products met all the limitations at least equivalently. *See Intellicall,* 952 F.2d at 1389; *Becton,* 922 F.2d at 798. Katz has presented no probative evidence, however, to establish that the limitations of his claims were met either literally or equivalently. Rather, Katz relies on his unsworn affirmation and that of his attorney. These affirmations, however, which are essentially identical, merely make conclusory allegations of equivalency. *See, e.g.,* Attorney Affirmation at ¶ 4; Katz Affirmation at ¶ 4 ("electonic [sic] embodiments [are] mere technological equivalents of the mechanical embodiments illustrated in my invention"). Such conclusory statements are insufficient evidence of equivalency. *See Malta v. Schulmerich Carillons, Inc.,* 952 F.2d 1320, 1327 (Fed.Cir. 1991) (evidence must demonstrate *"why* the overall function, way, and result of the accused device are substantially the same as those of the claimed device"), *cert. denied,* —— U.S. ——, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992); *see also Townsend Engineering Co. v. Hitec Co.,* 829 F.2d 1086, 1089 (Fed.Cir.1987) ("opinion about the meaning and application of various phrases and provisions of claim" do not create issues of fact precluding summary judgment).

■ Katz also argues that summary judgment should be denied based on alleged

"issues of fact" created by various denials in the pleadings. Katz contends that plaintiffs' denials of factual allegations in the counterclaim as well as AIWA's denials of factual allegations set forth in the complaint precludes summary judgment.[9] This argument borders on the frivolous. Rule 56(c) of the Federal Rules of Civil Procedure provides that a party opposing summary judgment "may not rest upon the mere allegations or denials" of its pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. As stated by the Federal Circuit:

> With respect to whether there is a genuine issue, the court may not simply accept a party's statement that a fact is challenged. The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or fact set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient.

*Barmag,* 731 F.2d at 835–36; *see also Chemical Engineering Corp. v. Essef Indus., Inc.,* 795 F.2d 1565, 1571 (Fed.Cir.1986) ("General assertions of fact issues, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden.").

Katz contends that genuine factual issue exist with respect to the doctrine of equivalents, and refers to the specification and Katz's Remarks submitted in response to the initial rejection of his patent application. Katz contends that "intended equivalents are EXPRESSLY set-forth in" his patent application and patent, and that the equivalents are therefore within the scope of the invention. Pl. Br. at 8. For example, the specification states that "the preferred embodiment utilizes a lever and/or equivalent control (such as buttons)...." '874 Patent at Col. 2, lines 50–53. In his Remarks, Katz stated that "it is clearly within the scope of the invention that the dials could optionally be push-button dials for electronically-dialing a combination lock...." Amendment and Ar-

guments, dated Jan. 8, 1987. Katz thus concludes that "during the prosecution it was made abundantly clear to the Examiner that the doctrine of equivalents applied, i.e. that the invention applied also to NON-mechanical versions...." Pl. Br. at 8.

Even assuming that the push-button element of AIWA's products is the equivalent to the "dial-type combination lock" of Katz's invention, this would still not preclude summary judgment for AIWA, since under the "all elements rule," Katz would have to demonstrate an issue of fact as to infringement as to *each* element in his claims.

However, there is a more fundamental flaw in Katz's argument. The premise of his argument is that the doctrine of equivalents as applied to his invention was determined during the patent prosecution. As noted above, however, the doctrine of equivalents is a judicially created doctrine to prevent fraud. *See Loctite,* 781 F.2d at 870 (doctrine "judicially devised to do equity"). The doctrine is not applied at the time of patent prosecution to establish equivalents that are encompassed by the claims of the patent. Thus, the fact that the Examiner granted the application for a patent, despite Katz's Remarks regarding push-button dial, does not mean that the claim encompasses push-button dials. As noted above, a key principle of our claim-based patent system is that the patented device is what the claims say it is. *Slimfold,* 932 F.2d at 1457.

As a general matter, Katz's opposition to the summary judgment motion, prepared by his attorney who is a registered patent attorney in the United States Patent and Trademark Office and a former Patent Examiner in that office, is wholly insufficient:

> Nowhere does [the plaintiff] recognize the controlling precedent on what is required to prove infringement under the doctrine of equivalents set out by the in banc court in *Pennwalt.* That case and its progeny are simply ignored. Under the test for infringement defined in *Pennwalt,* [the plaintiff] was required to proffer evidence

---

9. The brief and the Affirmations of Katz and Katz's attorney list each of AIWA's denials of the factual allegations of plaintiffs' complaint as well

as plaintiffs' denials contained in their Answer to AIWA's counterclaim.

that specific structure in [the defendant's] device met all the disputed limitations at least equivalently. [The plaintiff] avoids any specific comparison in this respect. . . .

*Becton,* 922 F.2d at 798 (citations omitted).

In any event, the security system of AIWA's products is in the prior art as to the Katz patent. Nakamichi Corporation ("Nakamichi") Model No. TD–1200, and U.S. Patent Nos. 4,710,907 ("Kobayashi, et al.") and 4,604,708 ("Lewis") were all in existence prior to Katz's filing of the patent application and disclose or incorporate security systems similar to that in the AIWA products.[10] Nakamichi Model No. TD–1200 mobile tuner/cassette deck has an electronic security system, which is disclosed in Kobayashi, et al. The security system is controlled by a microcomputer, which prevents operation of the player until the security code is entered. The user enters the code electronically by pressing the player's preset station buttons. If the correct code is received, the microcomputer permits the device's operation. The microcomputer prevents the player's operation by withholding or preventing the transmission of electrical signals otherwise issued by or to the microcomputer in response to activation of the player's operating switches. Lewis also discloses an electronic, microcomputer-controlled, keypad-button entered security system. If the entered code matches the code stored in the microcomputer's memory, the microcomputer signals a relay to provide power to the device, enabling it to operate. Similar to these devices, AIWA's security system uses a code entered electronically by pressing the preset station buttons and which is enabled and disabled through the player's microcomputer. Similar to these devices, no lever, lock or other mechanical means is used in the AIWA's products. Katz does not dispute that AIWA's products prac-

tice the prior art. Thus, because the scope of equivalency of what is literally claimed would encompass the prior art, there can be no finding of infringement. *Wilson,* 904 F.2d at 683. In fact, in light of the prior art, were the claims of the Katz patent to be construed to encompass AIWA's products, the patent would be invalid.

■ Finally, the prosecution history of Katz' patent estop him from now claiming patent infringement by AIWA's products. As discussed above, during prosecution of his patent, Katz distinguished what he deemed to be the closest prior art from his own invention. For example, in distinguishing Tscheulin, Katz stated that the electronic digital-controlled and microprocessor controlled unit in no way resembles the elements of his invention because the Tscheulin device lacked a manual lever and dial combination lock. These arguments estop Katz from now contending that his patent encompasses an electronic, digitally-controlled, microprocessor-based security system which has no lever means, such as the AIWA products. *See Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985) ("the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance"); *see also Townsend,* 829 F.2d at 1090 ("Prosecution history estoppel applies . . . 'to arguments submitted to obtain the patent.' ") (citation omitted).

Katz also makes the following argument that is difficult to understand. Katz somehow thinks it significant that during the patent prosecution, the Patent Examiner cited prior art and did not reject any of Katz's claims even though Katz "at length distinguished that prior art as merely 'another'

---

**10.** A product is in the prior art if it is "on sale in this country, more than one year prior to the date of the application for patent in the United States. . . ." 35 U.S.C. § 102(b). The Nakamichi product was first sold in the United States in the Spring of 1983. As noted above, Katz's patent application was filed on April 3, 1986. Thus, the Nakamichi product is prior art against the Katz patent. A product is also in the prior art if "the invention was described in a patent granted on an application for patent by another filed in

the United States before the invention thereof by the applicant for patent. . . ." 35 U.S.C. § 102(e). A patent issued to the Nakamichi Corporation on December 1, 1987 on an application filed in the United States on September 26, 1983. The patent therefore is also prior art against the Katz patent. The Lewis patent issued on August 5, 1986 on an application filed December 7, 1981. The Lewis patent is therefore also prior art against the Katz patent.

acknowledged equivalent electronic/electrical version of Plaintiff's mechanical version." Pl. Br. at 6. This argument is devoid of merit. The fact that the Examiner considered prior art and granted the application, failing to apply the prior art against the patent, does not mean that the claims encompass the prior art. To the contrary, granting an application in light of prior art indicates that the claimed invention is not anticipated by the prior art. Thus, when a patentee *distinguishes* prior art, it is for the purpose of explaining how it *differs* from the prior art as to justify granting of a patent. Here, Katz is attempting to assert his claims against the very products he distinguished in order to obtain the patent. As noted above, prosecution history estoppel prevents a patentee from recapturing, under the doctrine of equivalents, coverage given up during prosecution. *Loctite,* 781 F.2d at 870.[11]

■ Katz also argues that an issue of fact exists as to patent validity. He bases this argument on the fact that defendants alleged patent invalidity in their counterclaim, which plaintiffs have denied, and on the fact that the Patent Office "withdrew" its initial rejection of Katz's patent application after he responded to the rejection. This argument is of no avail. AIWA is not seeking a judgment of patent invalidity on this summary judgment motion. Rather, it seeks a judgment of *non-infringement,* and its arguments in support of its motion are premised on the assumption that the Katz patent is valid.

Based on all these reasons, AIWA is entitled to a judgment of non-infringement as a matter of law. *See, e.g., Jonsson v. Stanley Works,* 903 F.2d 812, 816 (Fed.Cir.1990) (summary judgment warranted where no literal infringement and where prosecution history estoppel precludes finding of infringement under doctrine of equivalents).[12]

### D. *Motion and Cross–Motion for Attorneys' Fees and Costs*

Both AIWA and Katz seek attorneys' fees pursuant to 35 U.S.C. § 285, 28 U.S.C.

§ 1927 and Rule 11 of the Federal Rules of Civil Procedure.

■ 35 U.S.C. § 285 provides that "[t]he Court in exceptional cases may award reasonable attorney fees to the prevailing party." "Circumstances held to be exceptional as to warrant the entitlement to fees include '... misconduct during litigation, vexatious or unjustified litigation, or a frivolous suit.'" *Refac Int'l, Inc. v. IBM Corp.,* 710 F.Supp. 569, 570 (D.N.J.1989) (*quoting Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.,* 738 F.2d 1237, 1242 (Fed.Cir. 1984)). A finding of an exceptional circumstance, however, does not mandate an award of attorneys' fees. *Reactive Metals & Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582 (Fed.Cir.1985). Rather, an award of attorneys' fees is within the discretion of the district court judge. *Id.* (*quoting Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1384 (Fed.Cir.1983)). The prevailing party has the burden of proving "facts which establish the exceptional character of the case." *Id.*

■ 28 U.S.C. § 1927 provides for sanctions where an attorney "multiplies the proceedings in any case unreasonably and vexatiously...." *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 757, 100 S.Ct. 2455, 2459, 65 L.Ed.2d 488 (1980); *Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 560 (3d Cir. 1985). A finding of bad faith is necessary in order to award attorneys' fees under 28 U.S.C. § 1927. *Hackman v. Valley Fair,* 932 F.2d 239, 242 (3d Cir.1991) (bad faith is a "prerequisite" under 28 U.S.C. § 1927).

■ Under Rule 11, any paper signed by an attorney must be "well grounded in fact and ... warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and ... not interposed for any improper purpose,

---

**11.** Plaintiffs' argument makes more sense if it is read as an attempt to demonstrate that the Katz patent is valid. AIWA, however, is not relying on the prior art in order to demonstrate that the Katz patent is invalid. It relies on the prior art to establish that its products, which are similar to the prior art, are not encompassed by the claims of Katz's patent.

**12.** My disposition of AIWA's summary judgment motion renders its motion in the alternative for judgment on the pleadings moot.

such as to harass or to cause delay or needless increase in the cost of litigation." Fed. R.Civ.P. 11. The standard to be applied with respect to Rule 11 is reasonableness under the circumstances. *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 289 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). Reasonableness requires an " 'objective knowledge or belief at the time of the filing of a challenged paper' that the claim was well-grounded in law and fact." *Id.* (*quoting Jones v. Pittsburgh Nat'l Corp.,* 899 F.2d 1350, 1359 (3d Cir.1990)). Generally, sanctions are to be imposed only under exceptional circumstances, *Morristown Daily Record, Inc. v. Graphic Communications Union, Local 8N,* 832 F.2d 31, 32 n. 1 (3d Cir.1987), for example, where the "claim or motion is patently unmeritorious or frivolous." *Doering v. Union County Bd. of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir.1988).

 This court finds absolutely no basis for imposition of sanctions against AIWA or its counsel. Katz's cross-motion is, therefore, denied. With regard to AIWA's request for fees, this court finds that this case does not present the exceptional circumstances necessary to justify imposition of attorneys' fees and costs under either 35 U.S.C. § 285 or Rule 11. Nor does this court find that there has been bad faith on the part of Katz so as to justify sanctions under 28 U.S.C. § 1927. Therefore, AIWA's request for attorneys' fees and costs is also denied.

### Conclusion

For the foregoing reasons, AIWA's for summary judgment of infringement as to the complaint and its counterclaim is granted. AIWA's request for attorneys' fees and costs and Katz's cross-motion for sanctions are denied.